IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SHOE SHOW, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:10CV13 |
| | ) | |
| ONE-GATEWAY ASSOCIATES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

This matter is before the Court on cross-motions for summary judgment [Docs. #37, #40] filed by Plaintiff Shoe Show, Inc. ("Plaintiff") and Defendant One-Gateway Associates, LLC ("Defendant"). For the reasons set out below, the Court will deny Plaintiff's Motion for Summary Judgment and will grant in part and deny in part Defendant's Motion for Summary Judgment. As such, this case is ready for trial. However, the Court notes that this case has been held in abeyance while discovery proceeded in a related ongoing proceeding between the parties in this Court (Case No. 1:14CV434). Therefore, the Court will set this matter for a Pretrial Conference, so that the parties can address an appropriate schedule for trial and the extent to which the proceedings should be coordinated.

I.    BACKGROUND

This case involves a business contract dispute concerning Plaintiff's lease of property at a shopping center in Summersville, West Virginia, from Defendant One-Gateway Associates. Plaintiff operates retail shoe stores, and is a North Carolina corporation with its

principal place of business in Concord, North Carolina. Defendant is the landlord for the space rented by Plaintiff, and is a West Virginia limited liability company. Plaintiff and Defendant entered into a lease agreement ("Lease") on August 20, 1999 for retail space in the Walmart Super Center plaza ("Center") in Summersville. The lease agreement was for a five-year period, with the option for three additional five-year extensions. The Lease contains the following co-tenancy provision (or "Major Tenant Vacating Clause"), which forms the basis of the parties' dispute:

> <u>Section 14.2 Major Tenant Vacating Clause</u> - In the event either Wal-Mart or Cato shall cease the conduct of business in the Shopping Center, and is not replaced within thirty (30) days of closing for business by another similar major tenant occupying at least ninety percent (90%) of the leased premises, then Tenant shall have the right to pay, twenty (20) days in arrears, monthly, four percent (4%) of Gross Sales in lieu of Minimum Annual Rent and all other to this charges pursuant Lease [sic]. In the alternative, should the similar major tenant not be in place within six (6) months of said closing for business, then Tenant shall have the right to cancel and terminate this Lease on thirty (30) days written notice to Landlord anytime thereafter.

(Lease [Doc. #1-2] at 15.)

In January 2006, the Cato store, which occupied 3,680 square feet of retail space, ceased operations. (McCue Dep. [Doc. #37-3] at 76:13-14;[1] McCue Aff. [Doc. #45] ¶ 15.) At the time Cato closed, Goody's, a 20,000 square foot clothing store, was occupying a separate retail space at the Center, and continued operating there until February 2009. (McCue Dep. [Doc. #43-2] at 46:5-7; McCue Aff. [Doc. #45] ¶ 8.) The space that Cato vacated remained empty until October 2007, when Defendant leased the space to Daystar Bible Book Store ("Daystar"). (McCue Aff. [Doc. #41] ¶ 9.) A J.C. Penny's catalog store, described as "more

---

[1] McCue served as Defendant's Rule 30(b)(6) representative.

or less just a return shop," also operated inside of Daystar. (Toler Dep. [Doc. #47-4] at 8:2-10.) Daystar ceased operations on September 24, 2011. (Statement of Correction and Amendment [Doc. #51] ¶ 6.) On October 3, 2011, a Factory Connection store opened in the former Cato Space. (Second Suppl. Initial Disclosures of Pl. [Doc. #60-1] at 1.)

Plaintiff's Lease Administration Department monitors compliance with company leases. (Wycoff Dep. [Doc. #43-3] at 12:16-25, 19:2-6.) The Lease Administration Department relies on the Operations Department for information related to lease compliance, including co-tenancy clauses. (Id. at 20:15-21.) The Operations Department, in turn, relies, at least in part, on district managers to report store closings, although the company has no formal policy establishing this duty of district managers. (Rutherford Dep. [Doc. #43-5] at 29:20-31:22.)

Martha Smith ("Ms. Smith") was Plaintiff's district manager responsible for Plaintiff's store in the Center. According to Plaintiff's Rule 30(b)(6) representative, John Manning ("Mr. Manning"), Ms. Smith "knew at some point, probably relatively soon after — much sooner than [Plaintiff's headquarters] knew — that Cato had closed." (Manning Dep. [Doc. #43-4] at 207:21-24.) The record is not clear on what she did with that information. Mr. Manning testified that Ms. Smith "has no recollection of reporting it to anyone. She has no recollection of [] much of anything else, actually." (Id. at 207:12-17.) Plaintiff's director of store operations, Leonard Rutherford ("Mr. Rutherford"), testified that he had "hoped" that Ms. Smith would have reported the closing of the Cato store and that he had "communicated to her that [he] would like to know when stores close in her shopping centers." (Rutherford Dep. [Doc. #43-5] at 57:6-25.) However, he declined to admit that reporting store closings was one

of his job "expectations" for Ms. Smith and would not agree that she "failed in her job duties because she didn't report" the closing. (Id.)

Defendant never provided Plaintiff with explicit notification that Cato had ceased operations in the Center. (McCue Dep. [Doc. #39-2] at 80:10-16; Def.'s Resp. to Pl.'s First Set of Interrogs. [Doc. #39-5] ¶ 5). The closing of Cato came to the attention of Jeffrey Wycoff ("Mr. Wycoff"), an employee of Plaintiff's Lease Administration and Real Estate Departments, in August 2009 when he was reviewing a lease renewal form. (Wycoff Dep. [Doc. #52-6] at 34:1-35:2.) The form contained a space for a "fashion tenant" which had "N/A" beside it, but the form also reflected that Plaintiff had a co-tenancy clause with Wal-Mart and Cato. (Id.) This caused Mr. Wycoff to seek confirmation of Cato's status. He reviewed Plaintiff's "reconciliation file," which contained current and historical year-end closing statements for charges for common area maintenance, insurance, and taxes, sent to Plaintiff by Defendant. (Id. at 47:15-48:4.) By reviewing those statements, Mr. Wycoff determined that Cato was listed as a tenant in the Center for the year 2005, but was not listed for the year 2006. (Id. at 49:9-14.) In addition, on August 14, 2009, Mr. Wycoff sent Ms. Smith an email asking for the date that Cato closed in the shopping center. (Id. at 53:6-13.) She responded that "[t]hey closed January of '06 or '07. I do not remember which but they closed as soon as the holiday season was over." (Id. at 54:3-5.) Mr. Wycoff testified that as far as he knew, Ms. Smith knew that Cato closed contemporaneously with its closing. (Id. at 54:23-55:14.) Mr. Wycoff also confirmed on August 14, 2009, through other sources, that Cato had closed in January 2006. (Id. at 56:16-57:19.)

4

By letter dated August 17, 2009, over three-and-a-half years after Cato closed and almost two years after Daystar began occupying the space, Plaintiff for the first time informed Defendant of its position that the co-tenancy provision of the Lease entitled it to pay 4% of its gross sales in lieu of the minimum annual rent ("alternative rental rate") during the period of March 2006 through August 2009. (Wycoff Aug. 17, 2009 Letter [Doc. #37-7].) Specifically, Mr. Wycoff wrote that 30 days after Cato's closing, Plaintiff "should have started paying 4% Gross Sales each month as its total monthly payment." (Id.) Defendant disputed Plaintiff's interpretation of the co-tenancy clause, and asserted that Plaintiff would be in default if it failed to pay the full Rent. (Stover Sept. 15, 2009 Letter [Doc. #37-8].) Plaintiff responded by stating that it would continue paying the full rental price, but that such payments would be made under protest and would not constitute a waiver of Plaintiff's rights under the Lease. (Wycoff Sept. 30, 2009 Letter [Doc. #37-9].)[2]

Plaintiff subsequently filed the present action asserting claims for breach of contract, money had and received, and unjust enrichment. (Compl. [Doc. #1] ¶¶ 36-59.) Plaintiff claims that from March 2006 until October 3, 2011, when Defendant leased the former Cato space to the Factory Connection, Plaintiff paid Minimum Rent and other charges totaling $394,736.82, while the alternative rental rate in the co-tenancy provision would have allowed

---

[2] This letter indicates that the first payment Plaintiff made under protest was for the rental period of September 2009.

it to pay a total of $165,854.25 — a difference of $228,882.57. (Second Suppl. Initial Disclosures of Pl. [Doc. #60-1] at 3.)

Following discovery, Plaintiff filed its present Motion for Summary Judgment [Doc. # 37], contending that Defendant breached the unambiguous co-tenancy provision of the Lease, entitling Plaintiff to recover the rental amount Defendant allegedly overcharged. Plaintiff also sought a declaration that Plaintiff was entitled to pay the alternative rental rate going forward until Defendant placed a satisfactory co-tenant in the former Cato space. (Pl.'s Br. [Doc. #39] at 2, 8.) Plaintiff notes that the Factory Connection began occupying the former Cato space on October 3, 2011, and Plaintiff does not contend that the Factory Connection did not satisfy the co-tenancy provision of the Lease or that Plaintiff is entitled to any damages arising after October 3, 2011. However, the Factory Connection subsequently ceased operations, and Plaintiff filed a related action (1:14CV434) requesting a declaration that it was entitled to pay the alternative rental rate under the co-tenancy provision after March 15, 2014, when the Factory Connection ceased operations. That suit is proceeding in discovery. In the present suit, Plaintiff argues that Daystar was not a "similar major tenant" as contemplated by the Lease's co-tenancy provision (Pl.'s Br. [Doc. #39] at 10), and that it acted promptly to exercise its rights under the Lease when it discovered that Cato closed (id. at 12).

Defendant also filed a Motion for Summary Judgment, contending that: (1) all of Plaintiff's claims are barred by waiver and the voluntary payment doctrine; (2) Plaintiff's claims for money had and received and unjust enrichment are barred by the existence of the Lease;

6

(3) Plaintiff's claims for damages prior to January 11, 2007 are barred by the statute of limitations; and (4) Plaintiff cannot recover attorney's fees. (Def.'s Mot. [Doc. #40] at 1.)

## II. DISCUSSION

### A. Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Id. at 255. A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in the light most favorable to the non-moving party. Id. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick Cty. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48). A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. See, e.g., Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994); see also Anderson, 477 U.S. at 248 (non-moving party may not rest upon mere allegations or denials.) "In considering cross motions for summary judgment, a district court should 'rule upon each party's motion separately and determine whether summary judgment

is appropriate as to each under the Rule 56 standard.'" Adamson v. Columbia Gas Transmission, LLC, 987 F. Supp. 2d 700, 703 (E.D. Va. 2013) (quoting Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999)). Therefore, the Court will first consider Plaintiff's Motion for Summary Judgment, and will then separately consider Defendant's Motion for Summary Judgment.

### B.    Plaintiff's Motion for Summary Judgment

In Plaintiff's Motion for Summary Judgment, Plaintiff argues that the co-tenancy provision of the Lease is unambiguous and that there is no dispute of material fact that Defendant breached that provision beginning in March 2006.[3]  (Pl.'s Br. [Doc. #39] at 8-9.) Plaintiff contends that it is entitled to $228,882.57, which represents the amount Plaintiff allegedly overpaid in rent and other charges pursuant to the Lease.[4]  (See Second Suppl. Initial Disclosures of Pl. [Doc. #60-1] at 3.)

As noted previously, Section 14.2 of the Lease provides for an alternative rent calculation "in the event either Wal-Mart or Cato shall cease the conduct of business in the Shopping Center, and is not replaced within thirty (30) days of closing for business by another

---

[3] As noted above, Plaintiff also asserted separate claims for money had and received and unjust enrichment. (Compl. [Doc. #1] ¶¶ 43-59.)  However, in its Motion, Plaintiff does not argue that it is entitled to summary judgment on these claims for relief.

[4] Defendant disputes this contention generally, and also argues that the Lease would not entitle Plaintiff to recover $51,750.34 in utility payments that Plaintiff made to third parties, which Plaintiff has included in its damages calculation.  (Def.'s Br. [Doc. #47] at 18.)  The Court notes that this disputed amount is likely to increase in light of Plaintiff's recently-updated damages calculation.  (See Second Suppl. Initial Disclosures of Pl. [Doc. #60-1] at 3.)  However, this dispute need not be resolved on the present motions in light of the Court's conclusion that Plaintiff's Motion for Summary Judgment should be denied, as further set out below. The Court does note that this dispute, and any dispute regarding the calculations of damages generally, implicates what Plaintiff contends is a typographical error in the co-tenancy provision, which states that Plaintiff shall be entitled to pay the alternative rental rate "and all other to this charges pursuant Lease" if the provision is triggered.  (Lease [Doc. #1-2] at 15.)  The Court does not resolve here the meaning of that provision as written.

*similar major tenant* occupying at least ninety percent (90%) of the leased premises . . . ." (Lease [Doc. #1-2] at 15 (emphasis added).)

Plaintiff first argues that Section 14.2 is unambiguous and that the Court may properly construe the contract as a matter of law, specifically with respect to the meaning of the phrase "similar major tenant" in the disputed Lease provision. (Pl.'s Br. [Doc. #39] at 8-11.) Plaintiff urges the Court to adopt the "ordinary meaning" of "similar" and "major" as defined by Webster's Dictionary. (Id. at 10-11.) Plaintiff states, "Webster's Dictionary defines *similar* as: '1) exactly corresponding; resembling in all respects; precisely like; 2) nearly corresponding; resembling in many respects; somewhat like; having a general likeness.' *Major* is defined as '1) Greater in number, quantity, or extent; 2) of greater dignity; more important.'" (Id. at 11 (emphasis in original).) As interpreted by Plaintiff, the co-tenancy provision required Defendant to lease the former Cato space to a "ladies' fashion apparel retailer." (Manning Dep. [Doc. #47-3] at 74:10-21.) Plaintiff contends that the provision "is not fairly or reasonably susceptible to [Defendant's] interpretation" that "similar major tenant" simply refers to a retailer that drives traffic to the Center. (Pl.'s Br. [Doc. #50] at 4-5.) Plaintiff argues that this interpretation is "inconsistent with the express terms that the replacement tenant be a 'major' tenant and one 'similar' to Cato . . . ." (Id. at 4.) Additionally, Plaintiff argues that accepting Defendant's construction of the provision would "remake the contract and impose liability upon the company which it did not assume." (Id. (internal quotation omitted).)

With respect to the time period that Daystar occupied the former Cato space (October 2007 to September 2011), Plaintiff asserts that Daystar was not a "similar major tenant" under the clear text of the co-tenancy provision. (Pl.'s Br. [Doc. #39] at 10-12.) In support of this

contention, Plaintiff notes that Daystar is "[a] religious bookstore with one location" and Cato is "a national retailer of women's fashion apparel and accessories." (Id. at 12.) Plaintiff argues that Daystar cannot satisfy the co-tenancy provision "merely because it occupies the Cato space or because [it] is a tenant that brings traffic to the Shopping Center or sells merchandise." (Pl.'s Br. [Doc. #50] at 8 (internal quotations omitted).)

Defendant argues that summary judgment is inappropriate because the co-tenancy provision is ambiguous. (Def.'s Br. [Doc. #47] at 11-14.) Defendant describes the parties' differing interpretations of the provision as follows: "Plaintiff restrictively contends that 'similar major tenant' must be a national or regional ladies' fashion apparel retailer," while Defendant "interprets the term to mean a retailer, satisfying the 'similar' portion, with a significant market presence to drive customers to the Center, satisfying the 'major' portion of the definition." (Id. at 12.) "Since [Defendant's] interpretation . . . is fair and reasonable," Defendant argues, "the Court is required to find that the Lease is ambiguous." (Id.) Further, Defendant contends that even if the Court finds the co-tenancy provision to be unambiguous, the provision was satisfied by the presence of Daystar in the Center. (Id. at 5, 16.) Defendant notes that Daystar "occupie[d] all 3,680 square feet formerly occupied by Cato[,]" it contained a J.C. Penny Catalog Center within the space, it had been in business in the area for over twenty years, and it was "the only Christian bookstore in a nearly fifty-mile radius and [served] customers from a five county area." (Id. at 5 (citing Toler Dep. [Doc. #47-4]).) Defendant

also points to Plaintiff's sales figures which it contends demonstrate "that Daystar has drawn traffic equal to or greater than Cato." (Id. at 16 (citing McCue Aff. [Doc. #41] ¶¶ 22-29).)

Plaintiff disputes Defendant's contentions, and in support of Plaintiff's argument that its claim is properly resolved at the summary judgment stage, Plaintiff cites two cases in which courts determined that certain tenants were not similar for purposes of co-tenancy provisions. (Pl.'s Br. [Doc. #39] at 11-12.) However, this Court finds that these cases do not support Plaintiff's position at the summary judgment stage. In Rathburn v. Cato Corp., 93 S.W.3d 771, 776 (Mo. Ct. App. 2002), the trial court resolved at a bench trial, not on summary judgment, the issue of whether current and previous co-tenants were "similar type and size businesses." Further, while affirming the trial court's ultimate conclusion that the co-tenants were not "similar type and size businesses," the appellate court found erroneous the trial court's conclusion that the co-tenancy provision was unambiguous. Id. at 779. On this issue, the appellate court stated:

> The phrase "similar type and size business" is obviously susceptible to honest differences in interpretation, and is indistinct and uncertain as to its application. While it is clear that "similar" means something less than identical, there is no guidance provided in the Lease concerning how "similar" another business must be to qualify as an acceptable replacement for a named major anchor tenant that vacates the shopping center. Likewise, the Lease is unclear regarding the intended qualifying characteristics that must be used to judge the required similarity. For instance, does a "similar type" business refer to the types of goods offered for sale and, if so, how "similar" must they be? Also, does "similar ... size business" refer to the square footage occupied by the replacement business, or does it refer to the amount of its sales?

Id. These questions also remain unanswered in the instant case.

In Fresh Pond Mall Ltd. P'ship v. Payless ShoeSource, Inc., 2009 WL 2603874, at *3 (Mass. Super. Ct. July 2, 2009), the second case cited by Plaintiff, the court found as a matter

of law that a new co-tenant was not a "comparable Key Tenant" under a co-tenancy provision of a lease. In that case, however, the party claiming that the new co-tenant satisfied the "comparable Key Tenant" provision failed to present any evidence in support of its position, and specifically "offered no expert affidavit in support of its contention. Nor did [it] offer by way of affidavit, financial data, sales records, sale volume data, market share data, or the like to demonstrate a triable issue on comparability. The bare assertion [that the new co-tenant] was a comparable Key Tenant is not enough to create a dispute necessary to defeat summary judgment." Id. The case at hand is distinguishable, as Defendant has proffered substantial evidence with respect to the similarity of Cato and Daystar.

Under North Carolina law,

> "[i]t is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument. When the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court and the court cannot look beyond the terms of the contract to determine the intentions of the parties. However, extrinsic evidence may be consulted when the plain language of the contract is ambiguous. Whether or not the language of a contract is ambiguous is a question for the court to determine. In making this determination, words are to be given their usual and ordinary meaning and all the terms of the agreement are to be reconciled if possible."

Stovall v. Stovall, 698 S.E.2d 680, 684 (N.C. Ct. App. 2010) (quoting Lynn v. Lynn, 689 S.E.2d 198, 204-05 (N.C. Ct. App. 2010)).[5] "If there is uncertainty as to what the agreement is between the parties, a contract is ambiguous." Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C., 658 S.E.2d 918, 921 (N.C. 2008). When the contractual terms at issue are

---

[5] This Court previously determined that the Lease at issue is a North Carolina lease and that North Carolina law controls its construction. (Order of J. Sharp dated Nov. 16, 2010 [Doc. #20].)

ambiguous, summary judgment is improper.  Id. at 922-23.  Said differently, "if the terms employed are subject to more than one reasonable meaning, the interpretation of the contract is a jury question." Robertson v. Hartman, 368 S.E.2d 199, 200 (N.C. Ct. App. 1988).

Here, the Court concludes that the term "similar major tenant" is ambiguous.  The plain language of the co-tenancy provision is far from clear, and the Court cannot fairly glean the parties' intention from the use of the words "similar" and "major." "Similar major tenant" is not defined in the Lease, and the Court declines to insert its own definition when the provision is reasonably susceptible to both parties' interpretation.  As stated in Rathburn, cited by Plaintiff, "[w]hile it is clear that 'similar' means something less than identical, there is no guidance provided in the Lease concerning how 'similar' another business must be to qualify as an acceptable replacement for a named major anchor tenant that vacates the shopping center." 93 S.W.3d at 779.  Accordingly, the Court cannot conclude as a matter of law that the co-tenancy provision was not satisfied during the time period Daystar occupied the former Cato space.

With respect to the time period that the former Cato space remained vacant before Daystar leased it in October 2007, Plaintiff states "there can be no argument about [Plaintiff's] right to pay alternative rent." (Pl.'s Br. [Doc. #39] at 9.)  In response, Defendant argues that Goody's was a "similar major tenant" which satisfied the co-tenancy provision during this time. (Def.'s Br. [Doc. #47] at 14.)  In support of this position, Defendant states that at the time of Cato's closing, Goody's was "in a separate building approximately 75 feet from the former Cato space," that it occupied over 20,000 square feet compared to the 3,680 [square] feet occupied by Cato," and that it "provided the Center and Plaintiff with an additional retail

13

store that was not part of the Center when the Lease was executed." (Id.) Defendant states that Plaintiff's argument that the Lease required a replacement tenant to occupy the same space as Cato is overly restrictive, especially given "the conduct between the [p]arties in which Plaintiff actually took possession of a different space two doors down from the space actually described in the Lease." (Id. at 15.) Lastly, Defendant contends that even if the presence of Goody's does not satisfy the co-tenancy provision, "such a breach is not actionable . . . because the breach is not material." (Id.) In reply, Plaintiff argues that Goody's did not satisfy the co-tenancy provision because: (1) it did not "replace" Cato, but rather had been present in the Center since November 2000; (2) it did not occupy the space that Cato vacated; and (3) Goody's "was contemplated to be part of the [Center] when [Plaintiff] leased its space . . . ." (Pl.'s Br. [Doc. #50] at 7.)

The alternative rental rate set out in the co-tenancy clause is triggered if Defendant does not "replace" Cato with "a similar major tenant occupying at least ninety percent (90%) of the leased premises" within thirty days after Cato ceases operations in the Center. (Lease [Doc. #1-2] at 15.) Read in isolation, the term "*the leased premises*" is not specifically defined with respect to which particular premises the replacement tenant had to occupy. However, reading the provision as a whole, because the co-tenancy provision requires that Cato, after closing, be *replaced* by "a similar major tenant occupying at least ninety [] percent of the leased premises," it is evident that "*the leased premises*" refers to the space that Cato vacated. Goody's commenced its operations in the Center more than five years before Cato closed, and it never occupied the space that Cato vacated. Thus, even though the reference to a "similar major tenant" is ambiguous, the co-tenancy clause is not reasonably susceptible to Defendant's

14

interpretation that Goody's replaced Cato and satisfied the co-tenancy provision.[6]

Accordingly, there is no genuine dispute of material fact that the co-tenancy provision was triggered beginning thirty days after Cato closed and until Defendant leased the former Cato space to Daystar in October 2007, that is, from March 2006 to October 2007. However, Defendant has raised affirmative defenses, including the statute of limitations and waiver. Plaintiff does not move for judgment in its favor on these defenses, and the parties have instead addressed these defenses as part of Defendant's Motion for Summary Judgment, discussed below. Therefore, the Court will not enter judgment in Plaintiff's favor for the period of March 2006 to October 2007 in light of the affirmative defenses raised by Defendant, which remain for trial as discussed more fully below with respect to Defendant's Motion for Summary Judgment. See infra Parts II.C.1, 2, and 4. Accordingly, the Court will deny Plaintiff's Motion for Summary Judgment.

## C. Defendant's Motion for Summary Judgment

Having determined that triable issues remain on Plaintiff's breach of contract claim, the Court now turns to Defendant's Motion for Summary Judgment and the affirmative defenses raised therein.

### 1. Waiver

Defendant first argues that Plaintiff waived any right it had to pay the alternative rental rate by continuing to fully pay rent and associated charges for several years after Cato ceased operating. (Def.'s Br. [Doc. #43] at 9.) "It is well established that '[a] party may waive a

---

[6] Because there is no ambiguity here, the Court will not go beyond the four corners of the Lease to inspect additional evidence of the parties' intent.

Case 1:10-cv-00013-JEP   Document 61   Filed 09/25/15   Page 15 of 26

contract right by an intentional and voluntary relinquishment." Fairview Developers, Inc. v. Miller, 652 S.E.2d 365, 369 (N.C. Ct. App. 2007) (quoting McNally v. Allstate Ins. Co., 544 S.E.2d 807, 809 (N.C. Ct. App. 2001)). "Waiver sometimes has the characteristics of estoppel and sometimes of contract, but it is always based upon an express or implied agreement. There must always be an intention to relinquish a right, advantage, or benefit. The intention to waive may be expressed or implied from acts or conduct that naturally lead the other party to believe that the right has been intentionally given up. There can be no waiver unless it is intended by one party and so understood by the other, or unless one party has acted so as to mislead the other." Klein v. Avemco Ins. Co., 220 S.E.2d 595, 598-99 (N.C. 1975) (internal quotation omitted).

> Waiver involves both knowledge and intention; one being essential to the other. . . . [W]aiver depends upon what one himself intends to do. . . . [Waiver] is a voluntary act, and exists only where one with full knowledge of a material fact does or forbears to do something inconsistent with the existence of the right or of his intention to rely upon that right. Knowledge of the existence of the right, benefit, or advantage on the part of the party claimed to have made the waiver is an essential prerequisite to its relinquishment. No one can be said to have waived that which he does not know, or where he has acted under a misapprehension of facts. Waiver or acquiescence, like election, presupposes that the person to be bound is fully cognizant of his rights, and, that being so, he neglects to enforce them, or chooses one benefit instead of another, either, but not both, of which he might claim. The knowledge may be actual or constructive; one cannot be willfully ignorant and relieve himself from a waiver, because he did not know. The question of waiver is mainly one of intention, which lies at the foundation of the doctrine. Waiver must be manifested in some unequivocal manner, and to operate as such it must in all cases be designed, or one party must have so acted as to induce the other to believe that he intended to waive, when he will be forbidden to assert the contrary.
>
> Since intent is an operation of the mind, it should be proven and found as a fact, and is rarely to be inferred as a matter of law. It should clearly be made to appear by the evidence, and the best evidence of intention is to be found in the language used by the parties, though it may appear in their conduct. The true

inquiry is what was done, said, or written, and whether it indicated the alleged intention.

Danville Lumber & Mfg. Co. v. Gallivan Bldg. Co., 97 S.E. 718, 720 (N.C. 1919).

In this case, the parties dispute whether Plaintiff's conduct exhibited an intentional relinquishment of its right to pay the alternative rental rate under the Lease. As evidence of an intentional relinquishment, Defendant points to Plaintiff's failure to exercise its right to pay lower rent and related charges from March 2006 through August 2009. (Def.'s Br. [Doc. #43] at 10-11.) However, in response, Plaintiff contends that it did not know of Cato's closure until August 2009, and that it acted promptly as soon as it became aware of the closure and did not intentionally waive its right to pay the alternative rental rate.

With respect to Plaintiff's knowledge, Defendant first contends that Plaintiff had actual knowledge of Cato's closure based on information in the year-end reconciliation statements. However, the Court concludes that the statements are inconsistent and ambiguous. For example, in statements listing tenant pro rata shares for January - December 2006 for common-area-maintenance and ice and snow removal, the space formerly occupied by Cato is identified as "Empty." ([Doc. #43-8] at 4, 35.) However, for the same time period, Cato is listed as a tenant on the "reimbursements" list, the "Nicholas Sanitation" list, the "insurance" list, and the "real estate taxes" list. (Id. at 18, 21, 26, 31.) In addition, the 2007 reconciliation statements, sent to Plaintiff in early 2008, identified Cato as a tenant on at least one of the forms. Therefore, the Court cannot conclude that there are no genuine issues of material fact and that, as a matter of law, Defendant had actual knowledge of Cato's status based on these reconciliation statements.

Defendant also contends that Plaintiff had knowledge of Cato's closing because the

17

local store manager, Ms. Smith, had actual knowledge of the closing that should be imputed to Plaintiff. As a general rule, "a principal is chargeable with, and bound by, the knowledge of or notice to his agent received while the agent is acting as such within the scope of his authority and in reference to a matter over which his authority extends, although the agent does not in fact inform his principal thereof." Norburn v. Mackie, 136 S.E.2d 279, 285 (N.C. 1964) (citing Ring Furniture Co. v. Bussell, 88 S.E. 484, 486 (N.C. 1916)); see also Reinninger v. Prestige Fabricators, Inc., 523 S.E.2d 720, 725 (N.C. Ct. App. 1999) (acknowledging "the general rule that the principal is chargeable with the knowledge of his agent."). Articulating this rule in further detail, the North Carolina Supreme Court stated:

> The rule, which imputes to the principal the knowledge possessed by the agent, and the extent of it, applies, as has been well said, only to cases where the knowledge is possessed by an agent within the scope of whose authority the subject–matter lies; in other words, the knowledge or notice must come to an agent who has authority to deal in reference to those matters which the knowledge or notice affects. The facts of which the agent had notice must be within the scope of the agency, so that it becomes his duty to act upon them or communicate them to his principal. As it is the rule that whether the principal is bound by contracts entered into by the agent depends upon the nature and extent of the agency, so does the effect upon the principal of notice to the agent depend upon the same conditions. Hence, in order to determine whether the knowledge of the agent should be imputed to the principal, it becomes of primary importance to ascertain the exact scope and extent of the agency.

Bussell, 88 S.E. at 487; see also England v. Am. S. Ins. Co., 380 F.2d 137, 140 (4th Cir. 1967) (applying West Virginia law and noting the general rule that an agent's knowledge will not be imputed to a principal "unless the notice is in regard to a matter coming within the sphere of the agent's duty").

The record before the Court establishes that Ms. Smith was Plaintiff's agent and that she possessed actual knowledge of Cato's closing at or near the time it closed. However, the

record is more opaque as to whether the knowledge she received was "in reference to a matter over which [her] authority extend[ed]." Norburn, 136 S.E.2d at 285. The "exact scope and extent of [Ms. Smith's] agency," which is "of primary importance" in determining whether her knowledge is rightfully imputed to Plaintiff, is far from clear. Bussell, 88 S.E. at 487. Construing the facts in the light most favorable to Plaintiff, the Court cannot find as a matter of law that Plaintiff had constructive knowledge or was willfully ignorant of Cato's closing before August 2009. See Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 723 S.E.2d 744, 750 (N.C. 2012) ("[The] question of constructive notice is generally a question for the jury . . . ." (internal quotation omitted)).

Defendant relies upon Medearis v. Trs. of Meyers Park Baptist Church, 558 S.E.2d 199 (N.C. Ct. App. 2001), where the North Carolina Court of Appeals affirmed the district court's granting of summary judgment in favor of the defendant on its waiver defense. However, in that case, the plaintiffs moved into their residence in 1999; had stated that they did not oppose the building of a church center upon lots restricted to residential uses shortly thereafter; had, prior to raising the issue of enforcing the residential restriction, negotiated with the church to reduce the size, orientation, and placement of the center building but never requested that it not be built; and knew that the church was incurring significant expenses preparing to build the center during the year prior to filing suit to enforce the restrictions. Id. at 207-08. On these facts, the appellate court affirmed the trial court's finding of waiver as a matter of law because the plaintiffs had, "by their conduct and statements, impliedly led [the defendants] to believe that [the plaintiffs] dispensed with their right to challenge the nonconformity." Id. at 208.

In contrast, in the present case, there are no such statements or interactions regarding the co-tenancy issue, and there is an insufficient basis to find waiver as a matter of law. Ultimately, the question before the Court is whether the undisputed facts establish that Plaintiff intentionally relinquished a known right to pay the alternative rental rate. The Court cannot conclude as a matter of law that Plaintiff's conduct implied such an intent. "Intent is an operation of the mind and should be proven and found as a fact and is rarely to be inferred as a matter of law." Harris & Harris Const. Co. v. Crain & Denbo, Inc., 123 S.E.2d 590, 596 (N.C. 1962) (analyzing the intent requirement in the context of a waiver defense). Although it is undisputed that Plaintiff continued paying the full rental amount without protest from March 2006 to August 2009, in light of the additional factual issues noted above, the Court cannot conclude as a matter of law that Plaintiff intended to relinquish its rights or that Plaintiff had full knowledge of the material facts.

2. Voluntary Payment Doctrine

Defendant next argues that the voluntary payment doctrine bars the recovery Plaintiff seeks. (Def.'s Br. [Doc. #43] at 12-13.) The Supreme Court of North Carolina has referred to the voluntary payment doctrine as a "well established rule of law that the voluntary payment of money by a person who has full knowledge of all the facts can not be recovered." Guerry v. Am. Trust Co., 68 S.E.2d 272, 274 (N.C. 1951). The doctrine enforces a "waiver in the nature of an estoppel." Id. at 275. "Where a person with full knowledge of all the essential facts dispenses with the performance of something which he has the right to exact, he therefore waives his rights to later insist upon a performance. A person may expressly dispense with the right by a declaration to that effect, or he may do so with the same result by conduct

which naturally and justly leads the other party to believe that he has so dispensed with the right." Id; see also Boydell v. Wells Fargo Bank, N.A., No. 2:12-CV-000035-MR, 2013 WL 5462255, at *1 (W.D.N.C. Sept. 30, 2013) ("Under the North Carolina doctrine of voluntary payment, a payment cannot be recovered if it is voluntarily made by a person with full knowledge of all facts relevant to the payment.").

Although Defendant has raised the voluntary payment doctrine as an affirmative defense separate and distinct from waiver, the Court notes the overlapping nature of the defenses. See Guerry, 68 S.E.2d at 647-48 (analyzing the voluntary payment doctrine in terms of a "waiver in the nature of estoppel"). Here, granting summary judgment in favor of Defendant would be inappropriate for the same reasons it is inappropriate as to the waiver defense. Therefore, the Court will not direct judgment in Defendant's favor on the voluntary payment defense.

### 3. Plaintiff's Unjust Enrichment and Money Had and Received Claims

Defendant argues that Plaintiff's Second and Third claims for money had and received and unjust enrichment, respectively, are barred by the existence of the Lease. (Pl.'s Br. [Doc. #43] at 16.) That is, Defendant contends that because a valid contract exists that governs the parties' relationship, Plaintiff may not recover in quasi-contract. (Id.) Plaintiff contends that these claims are properly brought as alternative forms of relief. (Pl.'s Br. [Doc. #44] at 16-17.)

It is unclear whether Plaintiff intended to assert its claims for money had and received and unjust enrichment as causes of action separate from its breach of contract claim, or whether the claims relate only to the measurement of damages. To the extent the claims are

based on a quasi-contract theory, they are barred by the existence of the Lease. See Atl. and E. Carolina Ry. Co. v. Wheatly Oil Co., Inc., 594 S.E.2d 425, 429 (N.C. Ct. App. 2004) ("The doctrine of unjust enrichment is based on 'quasi-contract' or contract 'implied in law' and thus will not apply [] where a contract exists between two parties."); Delta Envtl. Consultants of N. Carolina, Inc. v. Wysong & Miles Co., 510 S.E.2d 690, 694 (N.C. Ct. App. 1999) (disallowing a party's unjust enrichment claim based on overpayments where a contract "govern[ed] the relationship between the parties with regard to payment and services rendered."); see also Dean v. Mattox, 108 S.E.2d 541, 546 (N.C. 1959) ("[A]n action to recover for money had and received, under the doctrine of unjust enrichment, is an action on implied contract."). Here, there is no dispute that the Lease amounts to a binding contract between the parties.[7] Accordingly, the Court will grant Defendant's Motion for Summary Judgment to the extent Plaintiff asserts quasi-contract claims for money had and received and unjust enrichment. However, to the extent Plaintiff has asserted various bases for measuring damages on the breach of contract claim, the issue of damages will be resolved at trial.

### 4. Statute of Limitations

Defendant next argues that Plaintiff's claims for damages prior to January 11, 2007 are barred by North Carolina General Statute § 1-52(1)'s three-year statute of limitations for breach of contract claims. (Def.'s Br. [Doc. #43] at 13-16.) In response, Plaintiff contends that its claims are not time-barred because they fall under the ten-year limitations period set

---

[7] Plaintiff cites Eastway Wrecker Serv., Inc. v. City of Charlotte, 599 S.E.2d 410, 412 (N.C. Ct. App. 2004) for the proposition that breach of contract and quasi-contract (*quantum meruit*) claims may proceed simultaneously. However, in that case, the appellate court found that the trial court erred in dismissing the claim for recovery in *quantum meruit* only because the trial court assumed the existence of an express contract between the parties. Here, the existence of a valid contract has been established and is not disputed.

out in North Carolina General Statute § 1-47(2). Section 1-47(2) provides that an action "[u]pon a sealed instrument or an instrument of conveyance of an interest in real property" must be commenced within ten years. Here, there is no dispute that the Lease is not a sealed instrument. However, the parties dispute whether the Lease at issue is properly construed as "an instrument of conveyance of an interest in real property."

To the extent that this issue is raised at summary judgment, "[g]enerally, the question of whether a cause of action is barred by the statute of limitations is a mixed question of law and fact, but when the facts relating to a statute of limitations defense are not in dispute, the issue is a question of law, properly resolved by summary judgment." Teague v. Randolph Surgical Assocs., P.A., 501 S.E.2d 382, 385 (N.C. Ct. App. 1998). Here, "[t]he only question is which statute of limitations applies, and that is a question of law." Pottle v. Link, 654 S.E.2d 64, 67 (N.C. Ct. App. 2007).

Defendant argues that "North Carolina statutes have generally considered conveyances and leases as separate terms," and, thus, the Lease is not properly construed as "an instrument of conveyance of an interest in real property." (Def.'s Br. [Doc. #43] at 15). Plaintiff, citing Sample v. Towe Motor Co., Inc., 209 S.E.2d 524 (N.C. Ct. App. 1974), contends that a lease is both a contract and a conveyance of an interest in real property. (Pl.'s Br. [Doc. #44] at 16.)

The Court recognizes that a lease includes both property rights and contract rights. See Wal-Mart Stores, Inc. v. Ingles Markets, Inc., 581 S.E.2d 111, 115 (N.C. Ct. App. 2003) (stating that "[a] lease is a contract which contains both property rights and contractual rights." (internal quotation omitted)). However, that does not resolve the question of whether a lease

23

agreement is "an instrument of conveyance of an interest in real property" for purposes of § 1-47(2). In considering the question, the Court notes that Plaintiff has cited no case in which a North Carolina court has applied § 1-47(2)'s ten-year limitations period to an unsealed lease.[8] In contrast, it is the well-established rule in North Carolina that "claims for breach of contract and breach of a lease agreement must be asserted within three years of the date of the underlying breach." Glynne v. Wilson Med. Ctr., 762 S.E.2d 645, 649 (N.C. Ct. App. 2014) (citing N.C. Gen. Stat. § 1-52(1)). Plaintiff brings claims in this case based on the contractual terms of the Lease, and the Court finds no reason to depart from the general rule here. Therefore, the Court concludes that the three-year statute of limitations set out in North Carolina General Statute § 1-52(1) for breach of contract governs in this case. As such, Plaintiff's claims for damages accruing before January 11, 2007 are barred by the statute of limitations.

Accordingly, the Court will grant Defendant's Motion to the extent it seeks judgment in its favor on Plaintiff's claims accruing prior to January 11, 2007.

5. Attorney's Fees

Finally, Defendant seeks summary judgment as to Plaintiff's request for attorney's fees. In this case, Plaintiff seeks attorney's fees as an element of its damages. (Compl. [Doc. #1] ¶¶ 42, 51, 59.) Section 10.4 of the Lease states:

> In the event of any suit, action, or proceeding at law or in equity, by either of the parties hereto against the other, by reason of any matter or thing arising out of this Lease, the prevailing party shall recover not only its legal costs, but a

---

[8] While Plaintiff has cited cases in support of the position that a lease conveys an interest in real property, none of those cases addressed the issue in the statute of limitations context.

reasonable attorney's fee for the maintenance or defense of said action or suit, as the case may be."

(Lease [Doc. #1-2] at 10.)  Defendant contends that it is entitled to summary judgment on this claim because "[i]n North Carolina, attorneys' fees are not recoverable in a contract action without statutory authority even in the face of unambiguous contractual agreement."  (Def.'s Br. [Doc. #43] at 17.)  Defendant further contends that the only possible statutory basis for Plaintiff to recover attorney's fees — North Carolina General Statute § 6-21.2 — is insufficient.  (Id.)  In Response, Plaintiff contends that an award of attorney's fees can be statutorily or contractually based and that North Carolina General Statute § 6-21.2 permits Plaintiff's recovery of attorney's fees.  (Pl.'s Br. [Doc. #44] at 18-19.)

In considering this issue, the Court notes that under a recent decision in this Court, Defendant may ultimately prevail on this issue.  See Monsanto Co. v. ARE-108 Alexander Road, LLC, No. 1:10CV898, 2014 WL 2815778 (M.D.N.C. June 23, 2014) (finding that despite a contractual provision to the contrary, N.C. Gen. Stat. § 6-21.2 did not provide authority for the plaintiff to recovery attorney's fees where the plaintiff lessee made overpayments made to a defendant lessor), on appeal, Case No. 14-1737 (4th Cir. 2015).  However, the parties have not yet had the opportunity to address this authority.  Moreover, Plaintiff does not raise attorney's fees as a separate claim, and issues remain for trial as set out above.  In the circumstances, the Court concludes that resolving this issue on the present motion is

premature, but the Court will allow the parties to address the matter further at trial in light of the additional authority set out above.

III.     CONCLUSION

For the reasons set out above, Plaintiff's Motion for Summary Judgment will be denied, and Defendant's Motion for Summary Judgment will be granted in part and denied in part. Therefore, the Court will set this matter for a pre-trial conference to address an appropriate schedule for trial and to address the status of this case in light of the ongoing proceedings in the related case (Case No. 1:14CV434).

For the foregoing reasons, IT IS ORDERED that Plaintiff's Motion for Summary Judgment [Doc. #37] is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment [Doc. #40] is GRANTED IN PART and DENIED IN PART.  Specifically, Defendant's Motion is granted: (1) to the extent Plaintiff asserts quasi-contract claims for money had and received and unjust enrichment; and (2) as to Plaintiff's claims accruing prior to January 11, 2007, and those claims are dismissed.

IT IS FURTHER ORDERED that this matter is set for a Pretrial Conference on October 23, 2015, at 9:30 a.m. in Courtroom 3 of the United States Courthouse, Winston-Salem, North Carolina.

This, the 25th day of September, 2015.

_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge